IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2025

IN RE DEZIRAY J., ET AL.

**Appeal from the Juvenile Court for Sevier County**
**No. 2023-JT-10      Keith Cole, Judge**

_____

**No. E2024-01553-COA-R3-PT**
_____

This is an appeal by a father of the termination of his parental rights to his daughter. The Juvenile Court for Sevier County ("the Juvenile Court") terminated the father's parental rights after finding by clear and convincing evidence that the conditions which led to his daughter's removal persisted, that he had failed to manifest an ability and willingness to assume custody of his daughter, and that termination of his parental rights was in his daughter's best interest. The father appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Susan H. Harmon, Sevierville, Tennessee, for the appellant, Charles W.

Jonathan Skrmetti, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## Background

This case began in April 2022 when the Tennessee Department of Children's Services ("DCS") filed a petition for temporary legal custody of Leeann W. ("the Child") in the Juvenile Court. DCS alleged that the Child's father, Charles W. ("Father") uses and tested positive for THC and that the Child's mother, Lisa J. ("Mother"), tested positive for THC, Oxycodone, and Morphine. DCS alleged that the family was homeless and living from hotel to hotel. DCS alleged the Child and her half-siblings were dependent and neglected.[1] The Juvenile Court entered a protective custody order, placing the Child in DCS's custody. In July 2022, the Juvenile Court adjudicated the Child dependent and neglected based on both parents' lack of housing and Mother's substance abuse. The Child, born in 2017, was four years old when this case began.

In June 2023, the guardian *ad litem* ("the GAL") appointed for the Child filed a motion to suspend Father's visitation. The GAL alleged that Father had therapeutic visitation with the Child; the caseworker had concerns that Father's behavior with and affection toward the Child was inappropriate; during one visit the Child was lying on top of Father in the visitation room with the lights off; Father had moved to Illinois and not had visits with the Child in several weeks; the provider agency supervised a video call between Father and the Child; the Child wet her pants during the video call and "immediately transitioned to 'baby mode'"; Father showed her a puppy and explained how to tell the difference between a male and female dog; and the Child defecated on herself after the call. Before the video call, the Child had not had a bathroom accident in the daytime after being placed in her foster home. DCS further alleged that the Child was exhibiting concerning behaviors that needed to be addressed in therapy. Father also allegedly had threatened to get his daughter and take her back to Illinois. The Juvenile Court granted the motion in August 2023.

On June 14, 2023, DCS filed a petition to terminate Father's parental rights, alleging the statutory grounds of persistence of conditions and failure to manifest an ability and willingness to assume custody of the Child.[2] DCS specifically alleged that Father still lacked suitable housing and had behaved inappropriately during visits with the Child. Father filed an answer, claiming that his alleged failure to manifest an ability and willingness to assume custody was not willful.

---

[1] The Child's mother surrendered her rights to the Child and is not subject to this appeal. The Child's half-siblings have different fathers and are not subject to this appeal.

[2] DCS also alleged the statutory ground of abandonment by failure to support but voluntarily dismissed this ground before trial.

Trial occurred in September 2024. Father testified about the circumstances of the Child's removal into DCS custody, explaining that the Child and he were homeless, living out of motels at the time. After the Child was removed from his custody, Father lived in a homeless shelter for four months. He then lived with someone he had met at the homeless shelter before returning to the homeless shelter. He then lived with his employer for a time and then lived on the streets for a few nights before moving in with family in Illinois in 2023. He first lived with his sister before moving in with his brother and his brother's family, where he has lived since April 2023. His brother passed away at some point, but Father continues to live with his sister-in-law and niece. He sleeps in their living room.

He testified that he pays his sister-in-law $400 per month in rent, although they have no formal lease agreement. His sister-in-law does not own the home. He testified that his sister-in-law would allow the Child to live with them and that she would share a room with his eighteen-year-old niece. He acknowledged his sister-in-law could ask him to leave at any point. He could not provide any information or pictures of the home. Father detailed his varied work history and explained that he had worked at the same place for the past year. He works at least forty hours a week and has a driver's license.

In terms of permanency plan tasks, Father testified that he completed a parenting class, although he could provide no proof of having done so. He testified that he did not complete the recommended alcohol and drug classes because he "didn't know how it worked" or whether he would be charged for it. He attended a few alcohol and drug classes in Tennessee and attended for a month or two in Illinois, but he ultimately "didn't feel like it was something [he] really needed at the time," and he could not afford to take time off of work. He started therapy but did not follow through with it.

Kandi Kirk ("Kirk"), one of the DCS case managers for the Child, testified. She detailed Father's visitation history with the Child and explained her concerns with Father's inappropriate displays of affection for the Child. According to her, Father started out with supervised visitation. During these visits, Kirk observed that Father was constantly trying to keep the Child away from her or move the Child into areas where Kirk could not see him or the Child. After she informed him that she needed to be able to see him and the Child, he became frustrated and angry and would not follow her instruction.

Kirk then arranged visitations to occur in an observation room at the DCS office. She testified that when Father would greet the Child, he would pick her up, hug her, and kiss her on the mouth. He would rub her back so excessively that it made Kirk feel uncomfortable. She also explained that he "constantly" tried to take the Child to the restroom if she said she needed to use the restroom, and he was constantly wanting to hand feed her. Kirk acknowledged that she would normally encourage parents to take their children to the restroom, but "because of the way he was behaving, with the

excessive touching," she felt uncomfortable with him being alone with her in the restroom. She later explained that the Child had told her that she used to shower with and sleep in the same bed as Father prior to her removal into DCS custody.

Kirk testified that there were two more problematic instances during supervised visitation before Father's visitation was suspended. She described one visit when Father and the Child were visiting and watching a movie in the DCS office's visitation room. Kirk ended the visit after discovering that the lights were turned off and the Child was laying down on top of Father on a bed that was in the room.

The last visit before the Juvenile Court entered a no-contact order was a video call between Father and the Child after Father had moved to Illinois. According to Kirk, Father showed the Child a puppy and explained the difference between male and female dogs; the Child, now five years old, reverted back to baby talk; and the Child urinated and defecated on herself. Kirk testified that the Child started therapy after being placed in her current foster home.

Kirk also testified that Father had expressed his frustration and anger to her. He would call her "constantly," rant for hours at her, call her a liar, and call her disgusting for "even having those kinds of thoughts towards him."

With respect to Father's permanency plan responsibilities, Kirk testified that Father completed his mental health and alcohol and drug assessments but did not follow through with the resulting recommendations for drug education, therapy, or completion of a parenting assessment. While Father was still living in Tennessee, Kirk encouraged him to set up and complete these recommendations. She recommended Cherokee Health and Helen Ross McNabb to him and explained that these services would be of no charge. She also explained to Father that once he moved to Illinois, she would be unable to set these services up for him.

In terms of housing and employment, Kirk testified that she never visited his sister-in-law's home and did not even know where he was living at the time the termination of parental rights petition was filed. She explained that Father had asked Kirk to complete an Interstate Compact on the Placement of Children ("ICPC") home study on his sister's address and on his aunt's address. However, the plan fell through because Father's aunt and sister concluded that they did not want Father to have contact with the Child because of their concerns about his behavior. Father did not provide Kirk with proof of income in 2023 and when he did provide his employer's contact information, the employer informed Kirk that Father did not work there.

Rian Britt ("Britt"), the Child's most recent DCS case manager, testified. Britt explained that she had been unable to contact Father since taking the case in February 2024. She tried to call, text, and email him, but he never answered. With respect to the

Child, Britt testified that the Child had been in her current foster home since August 2023, had bonded to her foster family, and had been "doing great." However, the Child had "progressive issues of wetting the bed." Britt further stated that the Child told her that she is afraid of Father because he touched her "down there." She did not think that "CPS" opened an investigation. Britt also testified that the Child had engaged in "behaviors of touching" her vagina in front of everyone in the foster home. She clarified that the Child, however, had not exhibited this behavior in the past two months. The Child was on a waitlist for therapy.

Amanda Worley ("Worley"), the Child's case manager at "Smoky Mountain Children's Home," testified next. According to Worley, Smoky Mountain Children's Home provides in-home services to foster children. Worley testified that the Child had been seeing a therapist up until five months ago when her therapist quit. She also explained that the last time she had contact with Father was in May 2023. Father was allegedly very aggressive and demanding with her. He wanted to know where the Child was so he could pick her up and remove her from DCS custody.

The Child's foster mother, Jesse R. ("Foster Mother") testified that she had been the Child's foster mother since August 2023. She testified that the Child was succeeding in school, liked school, had lots of friends, and was always happy. She stated that her husband and she intend to adopt the Child and her half-brother if given the opportunity. In contrast to Worley's testimony, Foster Mother testified that the Child had not been to therapy while in her care. Foster Mother stated that her family and the Child are bonded.

At the close of proof, the Juvenile Court terminated Father's parental rights, finding that clear and convincing proof established the grounds of persistence of conditions and failure to manifest an ability and willingness to assume custody and that termination of his rights was in the Child's best interest. The Juvenile Court entered its final order on September 13, 2024. Father appealed.

## Discussion

Although not stated exactly as such, Father raises the following issues on appeal: (1) whether the Juvenile Court erred in finding that clear and convincing evidence established the statutory grounds of failure to manifest an ability and willingness to assume custody, pursuant to Tenn. Code Ann. § 36-1-113(g)(14), and persistent conditions, pursuant to Tenn. Code Ann. § 36-1-113(g)(3), and (2) whether the Juvenile Court erred in finding that clear and convincing evidence established that termination of Father's parental rights was in the Child's best interest.

- 5 -

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id*. at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

[5] Tenn. Code Ann. § 36-1-113(i).

that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

## *B. Standards of Appellate Review*

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate

- 8 -

parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

When DCS filed its termination petition, the relevant grounds for termination of parental rights were set out by statute as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

\* \* \*

(3) (A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

\* \* \*

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113 (West May 11, 2023 to June 30, 2023).

With respect to the ground of failure to manifest an ability and willingness to assume custody of the Child, the Juvenile Court made the following findings of fact:

Although [Father] shows a great deal of emotion today and seems sincere in his love for his child, he failed to complete the things he knew he was supposed to do to get custody of the child. He knew he was supposed to complete alcohol and drug education, individual therapy, and a parenting assessment. By his own words, he started some of these things but stopped them because he didn't feel like he needed them. Housing was also an issue at the beginning of this case and housing is still an issue now. [Father] lives in Illinois and says he has housing but the only information about the housing is that it is in Illinois and he is living with family. [Father] is not on the lease or mortgage for that home and is sleeping in the living room. [Father] could be removed from that housing at any point, thus making the housing unstable. Further, [Father] has a no contact order with the child which went into effect in August 2023. [Father] has not done anything in attempt to lift that no contact order. He has not had contact with the child in over one year at this point.

Placing the child into [Father's] custody would pose a substantial risk of harm to [the Child's] physical and psychological welfare because the child has urinated and defecated on herself after a video call with her father, she has been touching herself in a sexual manner, and she wets the bed at night. These behaviors altogether, along with [the Child's]

- 10 -

disclosures that the father showered with her and touched her vagina, indicate a real risk of physical and psychological harm to the child should she return to her father's custody.

The evidence does not preponderate against these findings.

This ground consists of two prongs that must be proven by clear and convincing evidence: "(1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). For the first prong, the petitioner need prove only that the parent failed to manifest either an ability or willingness. *Id.* at 677. Concerning the second prong, this Court has explained the meaning of "substantial harm" as follows:

> [T]he use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnote omitted).

On appeal, Father argues that he demonstrated both ability and willingness to assume custody, noting that he had been living in appropriate housing for at least a year, that DCS had made no real effort to confirm this, and that he had maintained stable employment. We agree with the Juvenile Court that Father did not establish stable housing in the more than two-year period since the case began. We are unable to conclude that the living room of his sister-in-law's rented home constitutes stable housing, particularly given that little is known about the suitability of the home. Kirk testified that an ICPC home study could not be conducted on his sister-in-law's home because Father did not complete all the assessments and his contact with the Child was suspended. In addition, his aunt and his sister decided not to participate in an ICPC home study because they felt Father should not have contact with the Child due to his concerning behavior.

Father failed to demonstrate a willingness based on his failure to follow through with assessment-recommended services, such as therapy, parenting assessment, or alcohol and drug classes. His excuse or justification for failing to follow through with these services was his work schedule and the fact that he felt he did not need them. Furthermore, Father's visitation with the Child was suspended more than a year before trial, and Father never attempted to have the order amended or rescinded. He also

- 11 -

stopped responding to DCS's calls, texts, and e-mails. After two years, Father failed to demonstrate an ability and willingness to assume custody.

For the second prong, risk of substantial harm, Father argues that DCS failed to present any evidence that the Child would be subjected to substantial harm if returned to his custody. Father argues that DCS's evidence regarding the video call in which the Child exhibited regressive behavior was insufficient to establish a risk of substantial harm because the testimony at trial was unclear as to whether the Child went to therapy after this incident. We find Father's argument unconvincing.

We agree with the Juvenile Court's assessment of the situation. As the Juvenile Court found, and obviously credited, testimony was presented from multiple sources that the Child reverted to baby talk and urinated and defecated on herself during or shortly after Father's last video call with the Child. Although this one incident alone may be insufficient to establish a risk of substantial harm, the Child also accused Father of touching her vagina while showering with her, and the Child herself touched her vagina in front of members of her foster family. The Juvenile Court credited the testimony against Father on this issue, and we defer to the Trial Court's assessment of the testimony and its credibility in the absence of clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary."). As the Juvenile Court found, there is clear and convincing evidence that the Child is at risk of substantial harm if returned to Father's custody. We affirm the Juvenile Court's finding of this ground by clear and convincing evidence.

For the ground of persistent conditions, the Juvenile Court made the following findings of fact:

> For the reasons outlined above and below, the Court finds by clear and convincing evidence that that this ground has been proven against [Father]. The child was removed from [Father's] custody 29 months ago through an order of this Court. The child was removed in part due to [Father's] lack of housing. The conditions that led to the removal still persist: [Father] says he has suitable housing but he lives with his sister in law, he is not on the lease or mortgage, and could be removed from the home at any time. The housing is not stable. Further, the housing is in Illinois and would require an Interstate Compact on the Placement of Children, ("ICPC"), home study before the Court could determine whether or not the housing was suitable. There is little chance that these conditions will be remedied soon so that [the Child] can be returned safely to the home because [Father] has had 29 months to remedy the conditions. Nor has [Father] completed the services that were recommended on his assessments. Continuation of the parent/child relationship greatly diminishes the child's

chances of being placed into a safe, stable and permanent home because she is in a stable foster home where she is bonded to her foster family and her siblings and the foster parents wish to adopt her should she become available for adoption.

The evidence does not preponderate against these findings.

Father presents similar arguments for why the Juvenile Court erred in finding this ground as well. Father's arguments are unconvincing for all the reasons previously stated. Specifically as to this ground, the evidence demonstrated that the Child had been removed from Father's custody for longer than six months. The conditions that led to the Child's removal—Father's unstable housing—remains. Father sleeps in his sister-in-law's living room. His name is not on the lease. Father provided no evidence of the housing's suitability. According to Kirk, DCS was unable to conduct an ICPC home study on his sister-in-law's home because of Father's own failure to complete all the assessments and because his contact with the Child was suspended. This Court has previously explained that "matters related to counseling and assessments are 'directly related to the establishment and maintenance of a suitable home.'" *In re Jaxson F.*, No. E2023-00326-COA-R3-PT, 2023 WL 7179319, at *4 (Tenn. Ct. App. Nov. 1, 2023) (quoting *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009)). Moreover, his aunt and sister were unwilling to offer their homes to the family or participate in an ICPC home study because of their concerns about Father's behavior.

In addition to Father's housing problem and failure to comply with assessment-provided recommendations, Father was accused of touching his daughter's vagina while they showered together. The Child reported to Britt that she was afraid of Father because of this. Although there was some confusion as to whether and when the Child was engaged in therapy, it is undisputed that the Child was on a waitlist for therapy at the time of trial. The dearth of available therapists does not detract from the Child's allegation. Father's unstable housing, unwillingness to follow through with recommendations, and the Child's accusation of inappropriate conduct, taken together, demonstrate that returning the Child to Father would put her at risk of further abuse or neglect. There is also no indication that Father will remedy these issues at an early date. He already had over two years to find stable housing, complete the assessment-provided recommendations, and petition the Juvenile Court to rescind the no-contact order, and yet failed to do so.

Lastly, continuation of the parent-child relationship diminishes her chances of integration into a safe, stable, and permanent home. Father and the Child had not spoken in over a year at the time of trial. Britt testified that the Child is afraid of Father. In contrast, Foster Mother testified that the Child and her foster family are bonded, the Child is succeeding in school, and the Child has friends. The Child's foster parents are willing

to adopt her and her half-brother. After two years in the limbo of foster care, the Child should not have to wait any longer to see if Father finds suitable housing and completes the assessment-provided recommendations. We affirm the Juvenile Court's finding of this ground by clear and convincing evidence.

Having affirmed the Juvenile Court's findings of clear and convincing evidence for at least one statutory ground, we move on to the Juvenile Court's best interest determination. At the time DCS filed the petition, the best interest factors listed in Tenn. Code Ann. § 36-1-113(i) read as follows:

> (i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
>
> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
>
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
>
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
>
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
>
> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
>
> (F) Whether the child is fearful of living in the parent's home;
>
> (G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
>
> (H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;
>
> (I) Whether the child has emotionally significant relationships with persons

- 14 -

other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West May 11, 2023 to June 30, 2023).

In finding that termination of Father's parental rights was in the Child's best interest, the Juvenile Court made the following findings of fact:

> As to [Father], the Court finds that the following factors weigh in favor of termination: A, B, C, D, E, F, H, I, J, K, L, M, N, P, and Q. The child is doing very well in the foster home. She is bonded with her siblings with whom she is placed, and she is very bonded to the foster parents and her foster siblings. These bonds should not be disrupted. The child is also doing well in school where she is in the first grade. She is on the waiting list for therapy to help address bedwetting and sexualized behaviors. [Father] knew what steps he needed to complete and failed to do so. [Father] has been absent from the child's life for over one year at this point. [Father] had the opportunity to contest the motion for no contact but did not appear at the hearing. Nor has he asked counsel to file pleadings in this Court to contest the no contact order. Any attachment he and [the Child] have at this point is not a healthy attachment considering the combination of [Father's] inappropriate conduct during visitations, showering naked with the child when she was in his care, and [the Child's] disclosures that [Father] touched her on her vagina during these showers. The child has also expressed that she is scared of her father.

[Father] has also been absent from the DCS case for most of this year. He has not returned calls and emails from the current DCS worker. DCS supervised his visitations and paid for therapeutic visitations. DCS also set up his initial assessments and then directed him where he could complete the recommendations from the assessments (therapy, alcohol and drug classes, parenting assessment). [Father] began therapy but then stopped because he did not feel that he needed it. [Father] had a list of what he needed to do to get the ball rolling and he failed to do it. [Father] has not demonstrated the ability or commitment to creating and maintaining a home that meet's the child's basic and specific needs and in which the child can thrive. [Father] also lacks suitable housing.

Factors that are neutral as to [Father] are G, O, R, and T. Factor S weighs against termination for [Father] because he testified that he has been paying child support in the amount of approximately $250 every two weeks.

The evidence does not preponderate against these findings.

Father contends that practically every factor should have weighed against termination. With respect to factor (A), Father argues that there was no evidence that returning the Child to Father's care would negatively affect the Child's need for stability and continuity. Based upon the testimony, the Child is bonded to her foster family and well-adjusted with them. In contrast, Father is sleeping in his sister-in-law's living room after years of homelessness, and the Child has expressed fear of Father. We agree with the Juvenile Court that this factor weighs in favor of termination.

Concerning factor (B), Father argues that there was no evidence that a return to his care would cause the Child emotional, psychological, or medical issues because the Child was not currently in therapy. However, the Child was on a waitlist for a therapist at the time of trial and told Britt that she was afraid of Father because he touched her inappropriately. Moreover, the Child urinated and defecated on herself and reverted to baby talk during the last video call with Father. For these same reasons, factors (D), secure and healthy parental attachment; (F), fear of living in parent's home; and (N), any abuse or neglect present in the parent's home, weigh in favor of termination.

We also agree with the Juvenile Court that factors (C), continuity and stability in meeting the Child's material needs; (J), lasting adjustment in circumstance, conduct, or conditions; (M), a sense of urgency in addressing the reasons for the Child's removal; (P), an understanding of the Child's needs; and (Q), ability and commitment to creating and maintaining a home that meets the Child's needs, all weigh in favor of termination. Father has not demonstrated continuity or stability in providing for the Child's needs. Before the Child's removal, Father and the Child were living from motel to motel. At the

time of trial, Father had not had contact with the Child in over a year, and other than child support payments, there was no evidence he took care of any of her material needs, such as housing, education, and safety. Again, Father's housing situation is tenuous as he is living in his sister-in-law's living room without his name on the lease.

Moreover, he has not demonstrated a sense of urgency in addressing the conditions that led to the Child's removal. He has not completed the assessment-provided recommendations because of his work schedule and his feeling as though the recommendations were unnecessary.

We agree with the Juvenile Court that factor (E), regular visitation, weighs in favor of termination. The Child and Father have not spoken to or seen each other in over a year. Although this is in part due to the no-contact order in place, Father never tried to have the order rescinded. In any event, "[t]he child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Regardless of the reasons for Father's lack of visitation, a one-year absence from a parent is a long time in the life of a five-year-old.

Factors (H), healthy parental attachment with someone else, and (I), emotionally significant relationships with persons other than parents and caregivers, weigh in favor of termination. The Child is bonded to her foster parents and their children. In addition, the Child is living with at least one of her half-siblings with the possibility of her other half-sibling rejoining the foster family at a later date. Given that Father is not the father of her siblings, the Child appears to have a better chance at growing up with her half-siblings in the foster home than if she were to live with Father, who now lives in Illinois.

Lastly, we agree with the Juvenile Court that factors (K), whether the parent has taken advantage of available programs, and (L), whether DCS made reasonable efforts in assisting the parent, weigh in favor of termination. Kirk testified that she recommended two organizations that offer free services, which would have satisfied Father's recommendations for alcohol and drug education and therapy. Father did not meaningfully engage in these recommended services by his own testimony, and he eventually failed to maintain contact with DCS. For all the foregoing reasons, we find that clear and convincing evidence established that termination of Father's parental rights was in the Child's best interest.

Upon our review of the record and the Juvenile Court's findings, we affirm the Juvenile Court's termination of Father's parental rights to the Child.

## Conclusion

For the foregoing reasons, we affirm the Juvenile Court's judgment and remand for collection of costs below. Costs of the appeal are assessed against the appellant, Charles W., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE